IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| RICKEY HARMON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) Case No. 12-cv-0021-MJR-SCW |
| CYNTHIA JORDAN, | ) |
| SARAH FARRIS, | ) |
| NURSE JOYCE, | ) |
| NURSE GALE, and | ) |
| NURSE MELVIN, | ) |
| | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM AND ORDER

**REAGAN, District Judge:**

### INTRODUCTION AND PROCEDURAL HISTORY

Plaintiff Rickey Harmon brought this action for violations of his constitutional rights pursuant to 42 U.S.C. § 1983. In his 2012 Complaint, Plaintiff alleges that Defendants were deliberately indifferent to his serious medical need of vomiting and fainting after coming off a hunger strike. There are two Motions currently pending before the Court: a Motion for Summary Judgment filed by the defendant nurses Farris, Joyce, Gale and Melvin (all of them employees of Wexford Health, the Illinois' Department of Corrections' medical contractor), and a Motion for Summary Judgment filed by Defendant Cynthia Jordan, an officer at Pinckneyville Correctional Center.

Both dispositive motions were filed March 21, 2014. Plaintiff filed his Response to both Motions on June 30, 2014, (Doc. 81), and no reply has been filed. The motions are ripe for ruling.

1

For the following reasons, the Wexford Defendants' Motion for Summary Judgment **(Doc. 71)** is **GRANTED**.  Jordan's Motion for Summary Judgment **(Doc. 74)** is **DENIED in part and GRANTED in part.**

### SUMMARY JUDGMENT STANDARD

Summary judgment is proper only if the admissible evidence considered as a whole shows there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law.  *Dynegy Mktg. & Trade v. Multiut Corp.*, **648 F.3d 506, 517 (7th Cir. 2011); Fed. R. Civ. P. 56(a).**  The party seeking summary judgment bears the initial burden of demonstrating—based on the pleadings, affidavits and/or information obtained via discovery—the lack of any genuine issue of material fact.  *Celotex Corp. v. Catrett,* **477 U.S. 317, 323 (1986)**.  In determining whether a genuine issue of material fact exists, the Court must view the record in a light most favorable to the nonmoving party.  *Anderson v. Liberty Lobby, Inc.* **477 U.S. 242, 255 (1986)**.  A dispute is "genuine" only if a reasonable jury could find for the nonmoving party.  *Id.* **at 248**.

At summary judgment, the Court's role is not to evaluate the weight of the evidence, to judge witness credibility, or to determine the truth of the matter, but rather to determine whether a genuine issue of triable fact exists.  *Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, **528 F.3d 508, 512 (7th Cir. 2008).**

### FACTUAL BACKGROUND

Pursuant to 42 U.S.C. § 1983, Rickey Harmon, previously incarcerated at Pinckneyville and now an inmate at Hill Correctional Center, brought this case on the theory Defendants violated his Eighth Amendment rights by showing deliberate indifference to his medical needs because they failed to immediately address his vomiting after coming off of a hunger strike.  As a result, he claims, he passed out and hit his head on two separate occasions.  (Doc. 1).  The threshold order divided

Plaintiff's Complaint into two counts: 1) against Jordan, Farris, Joyce, and Gale based on Plaintiff's gastrointestinal problems and 2) against all Defendants based on Plaintiff's head injuries. (Doc 5).

Plaintiff has been incarcerated since 1997. (Pl.'s Dep. p. 8). Plaintiff was a resident of Pinckneyville Correctional Center from October 2007 through October 2009. On approximately August 20, 2009, Plaintiff began a hunger strike due to his placement on investigative status in segregation. (Pl.'s Dep. pp. 13-14). There is some murkiness regarding the length of the hunger strike: in his Complaint, Plaintiff alleged it lasted 48 hours (Doc. 1, p. 6); in his Response, he alleges it lasted three days. (Doc. 81, p. 1). Plaintiff was placed in segregation intake with other prisoners on hunger strikes and/or suicide watch. (Pl.'s Dep. p. 16). In the hunger strike/suicide watch wing, a nurse is supposed to make the rounds daily and officers must walk to the wing every fifteen minutes. (Pl.'s Dep. p. 16). An inmate needed medical attention, is supposed to alert the officer. (Pl.'s Dep. p. 17).

On August 21, 2009, Plaintiff was taken to see the assistant Warden between 10:30 and 11:00 a.m. to discuss his hunger strike. (Pl.'s Dep. p. 62). Plaintiff ended his hunger strike after that meeting. (Pl.'s Dep. pp. 19-20). Health care was notified. (Doc. 72-5, p. 1). He testified that he saw Farris come past that morning and he tried to stop her, but she said she couldn't stop because she didn't have time. (Pl.'s Dep. p. 48). Plaintiff testified that Farris walked by in the morning, and somewhat inconsistently testified that there was already vomit everywhere (Pl.'s Dep. p. 49); later he testified that he did not begin throwing up until around noon. (Pl.'s Dep. p. 66). He implied that she did not see the vomit because she never stopped walking. (Pl.'s Dep. p. 49). An outsider could only see the whole cell if they looked through the chuckhole. (Pl.'s Dep. p. 84). The only other times Plaintiff saw Farris was when she was passing out meds to other inmates. (Pl.'s Dep. p. 50). Plaintiff also testified that he did not see a nurse until after he fell on the 21st. (Pl.'s Dep. p. 85). In his Response, Plaintiff alleges that he saw Farris before he fell while she was doing her rounds. (Doc. 81,

3

p. 4). Farris has no recollection of seeing Plaintiff during the relevant time period, and her name is not in any medical records. (Doc. 72-1).

Plaintiff was not experiencing any gastrointestinal issues prior to ending his hunger strike. (Pl.'s Dep. pp. 20, 55). He ate lunch that day around 11:15-11:30 am, and then threw up his food approximately fifteen minutes later. (Pl.'s Dep. pp. 20, 55). He vomited and noted some blood in it. (Pl.'s Dep. p. 21). He also experienced stomach pains. (Pl.'s Dep. p. 21). The officer walking the ward saw the vomit on the floor and informed Lieutenant Cynthia Jordan. (Pl.'s Dep. p. 21). Plaintiff does not recall the officer telling Jordan that he was vomiting; he only recalls him stating that he needed medical attention. (Pl.'s Dep. p. 68). According to Plaintiff, Jordan responded by saying "F him, he shouldn't have been on hunger strike in the first place." (Pl.'s Dep. p. 48). Plaintiff testified that Jordan yelled: "Harmon, I ain't getting you shit. Fuck you." (Pl.'s Dep. p. 66). The nurse had not made her daily rounds at this time. (Pl.'s Dep. p. 21). Plaintiff did not hear any more of the guard's conversation, although he believes that Jordan and the guard talked further. (Pl.'s Dep. pp. 70-71). Plaintiff testified that he did not see a nurse prior to his fall on August 21, 2009. (Pl.'s Dep. p. 22). Jordan submitted an affidavit stating that she was unaware that Plaintiff was experiencing medical issues prior to his fall. (Doc. 75-2, p. 2). Jordan was not aware that Plaintiff threw up blood and did not see any in his cell. (Doc. 75-2, pp. 1-2).

At approximately 3:00 pm on August 21, 2009, Plaintiff fell. (Pl.'s Dep. p. 22). Plaintiff believes Lt. Bradley found him, at which time the staff called a medical emergency and took Plaintiff to the health care unit. (Pl.'s Dep. pp. 22, 73). Jordan submitted an affidavit that she found Plaintiff on the floor with a knot in his head near some clear liquid. (Doc. 75-2, p. 1). Plaintiff hit his head on the toilet and experienced significant swelling. (Pl.'s Dep. p. 23). Once at the infirmary, Plaintiff received Tylenol and a bag of ice. (Pl.'s Dep. p. 24). Staff also conducted an examination. (Pl.'s Dep. p. 24). Dr. Obadina prescribed a liquid diet for twenty-four hours and Tylenol and discharged

4

Plaintiff back to segregation. (Pl.'s Dep. pp. 24-25, 27) (Doc. 72-5, p. 1). Instructions were given to Plaintiff at approximately 3 pm and he verbalized understanding. (Doc. 72-5, p. 4). The medical records reflect that the nurse came by at 6:30 pm. (Doc. 72-5, p. 5). Plaintiff's headache was relieved by Tylenol, but he still had swelling and tenderness. (Doc. 72-5, p. 5). Plaintiff also reported that he threw up a little with supper. (Doc. 72-5, p. 5). The records reflect that Plaintiff was going to be moved to a different cell. (Doc. 72-5, p. 5). A nurse came by again at approximately 9:00 pm to give him some more Tylenol and check on him. (Pl.'s Dep. p. 29).

On August 22, 2009, Plaintiff was moved to the R5 segregation unit. (Pl.'s Dep. p. 30). Plaintiff asked the guard who transferred him if he could see the nurse. (Pl.'s Dep. pp. 31-32). He was told to put in a sick call slip, which he did. (Pl.'s Dep. p. 32). Plaintiff testified that he once again began experiencing dizziness and vomiting. (Pl.'s Dep. p. 33). Plaintiff saw nurses Joyce Lucas and Melvin on August 22 while they were passing out medication to other inmates. (Pl.'s Dep. p. 34). Plaintiff believes one of those nurses told him to put in a sick call slip. (Pl.'s Dep. p. 34). They did not stop at his cell. (Pl.'s Dep. p. 88). Plaintiff's medical records reflect that a non-defendant nurse checked on him at 9 pm on August 22, 2009, and Plaintiff reported that he was "doing ok" and had eaten his evening meal. (Doc. 72-5, p. 6). A non-defendant nurse also observed Plaintiff at 4:00 am on August 23, 2009 and noted that he appeared to be resting comfortably with no obvious signs of distress. (Doc. 72-5, p. 6).

Plaintiff also believes Officer Barlotti took him to sick call line on either August 22 or August 23. (Pl.'s Dep. pp. 35-36). He may have seen Nurse Gale at sick call, although is Plaintiff testified he was not sure on that point. (Pl.'s Dep. pp. 35-36). Plaintiff also testified inconsistently that he may have seen Melvin at sick call. (Pl.'s Dep. p. 53). Plaintiff later testified that he saw Melvin at sick call and had a bloody nose at that time. (Pl.'s Dep. p. 86). He was experiencing vomiting, headaches, nosebleeds, and was unable to eat. (Pl.'s Dep. p. 36). Plaintiff continued to try to eat his regular meal

5

tray, but kept throwing up his meals. (Pl.'s Dep. p. 37). Melvin submitted an affidavit stating that she has no independent recollection of Plaintiff during the relevant time and that her name is not in the medical records. (Doc. 72-2).

At approximately 3:15 pm on August 23, 2009, Plaintiff fainted again and was taken to the health care unit. (Pl.'s Dep. p. 37) (Doc. 72-5, p. 7). Plaintiff awoke in the health care unit after being administered smelling salts. (Pl.'s Dep. p. 38). He had a bump on his head and a cut. (Pl.'s Dep. p. 38). Plaintiff was put in the observation room and given ice and Tylenol. (Pl.'s Dep. p. 39). Dr. Obadina examined him. (Pl.'s Dep. p. 39) (Doc. 72-5, p. 7). Plaintiff was eventually sent to Pickneyville Community Hospital, where he was diagnosed with a concussion. (Pl.'s Dep. pp. 38-39). He was released back to the health care unit where he stayed for an additional day or two. (Pl.'s Dep. p. 41). He was then released back to segregation, where he was moved to a lower gallery and given ice and medication. (Pl.'s Dep. pp. 41-42).

Plaintiff saw Nurse Joyce Lucas walking by his cell passing out meds. (Pl.'s Dep. p. 50). He asked for medical treatment, but she told him to sign up for sick call. (Pl.'s Dep. p. 50). Plaintiff does not recall what date or time this happened. (Pl.'s Dep. p. 50). He alleges the C/O confirmed to Nurse Lucas that Plaintiff was ill, and that Plaintiff had a nosebleed and vomit on the floor of his cell at that time. (Pl.'s Dep. p. 51). Lucas does not recall seeing Plaintiff during the relevant time period and is not mentioned in his medical records. (Doc. 72-4, p. 1).

Plaintiff alleges he saw Nurse Gale pass out medication after he returned from the hospital and told her that he still felt ill. (Pl.'s Dep. pp. 51-52). She told him the health care unit was doing all it could at that time. (Pl.'s Dep. p. 52). The medical records reflect that Plaintiff saw Gale in the infirmary at 1:30 pm on August 24, 2009, at which time he reported "I'm okay." (Doc. 72-5, p. 9). Gale performed an objective assessment as well and noted that that Plaintiff was scheduled for continued observation in the infirmary and that per the nurse at the ER, his CT and x-ray were

negative. (Doc. 72-5, p. 9). Plaintiff was examined by a non-defendant nurse at 8 pm on August 24, 2009. (Doc. 72-5, p. 14). Plaintiff asked for more ice, but denied he needed more Ultram (a pain medication prescribed by Dr. Obadina). (Doc. 72-5, p. 14). He was observed again in the infirmary at 11:45 pm by a different non-defendant nurse. (Doc. 72-5, p. 15). Dr. Obadina examined Plaintiff on the morning of August 25, 2009 at 8:30 am and ordered him discharged. (Doc. 72-5, p. 16). Gale reported that she gave Plaintiff his dose of Ultram and discharged him from the infirmary. (Doc. 72-5, p. 17). Plaintiff was given a follow-up appointment on Friday. (Doc. 72-5, p. 17). The records reflect he was seen in the med call line on August 28, 2009 at 8:25 am. (Doc. 72-5, p. 18).

### DELIBERATE INDIFFERENCE STANDARD

Prison officials violate the Eighth Amendment's proscription against "cruel and unusual punishments" if they display deliberate indifference to an inmate's serious medical needs. *Greeno v. Daley*, 414 F.3d 645, 652–53 (7th Cir. 2005) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (internal quotation marks omitted)). *Accord Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 828 (7th Cir. 2009) (**"Deliberate indifference to serious medical needs of a prisoner constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution."**). A prisoner is entitled to reasonable measures to meet a substantial risk of serious harm — not to demand specific care. *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997).

To prevail, a prisoner who brings an Eighth Amendment challenge of constitutionally-deficient medical care must satisfy a two-part test. *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011), *citing Johnson v. Snyder*, 444 F.3d 579, 584 (7th Cir. 2006). The first prong is whether the prisoner has shown he has an objectively serious medical need. *Arnett*, 658 F.3d at 750. *Accord Greeno*, 414 F.3d at 653. A medical condition need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated. *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010). *Accord*

7

*Farmer v. Brennan*, 511 U.S. 825, 828 (1994) (violating the *Eighth Amendment* requires "deliberate indifference to a *substantial* risk of *serious* harm.") (internal quotation marks omitted) (emphasis added). Only if the objective prong is satisfied is it necessary to analyze the second, subjective prong, which focuses on whether a defendant's state of mind was sufficiently culpable. *Greeno v. Daley*, 414 F.3d 645, 652–53 (7th Cir. 2005).

Prevailing on the subjective prong requires a prisoner to show that a prison official has subjective knowledge of—and then disregards—an excessive risk to inmate health. *Greeno*, 414 F.3d at 653. The plaintiff need not show the physician literally ignored his complaint, just that the physician was aware of the serious medical condition and either knowingly or recklessly disregarded it. *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008). Deliberate indifference is not negligence; rather it is more akin to intentional wrongdoing. *McGee v. Adams*, 721 F.3d 474, 480 (7th Cir. 2013) (citing *Johnson v. Snyder*, 444 F.3d 579, 585 (7th Cir. 2006)). The standard is criminal recklessness, and even gross negligence will not meet this standard. *Id.* at 481.

A court will defer to the treatment decisions of medical professionals unless the decision is clearly outside the bounds of a minimally competent decision. *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011). A medical professional will only be found liable under a deliberate indifference standard if the decision "is such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible did not actually base the decision on such a judgment." *Sain v. Wood*, 512 F.3d 886, 894-95 (7th Cir. 2008). Medical malpractice is not deliberate indifference. *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008).

*1. Count One: Deliberate Indifference to Nausea*

    A.  **Serious Medical Need (Gastrointestinal Problems)**

A medical need is "serious" if it has been diagnosed and treated by a physician, or is so obvious that a layperson would recognize the condition as requiring treatment. *Thomas v. Walton*,

**461 F.Supp.2d 786, 793 (S.D. Ill. 2006) (citing** *Gutierrez v. Peters***, 111 F.3d 1364, 1373 (7th Cir. 1997))**. Plaintiff alleges that he went on a hunger strike of one to three days. When he went off the hunger strike, he experienced nausea, vomiting, and ultimately fainting. His issues with fainting lead to a concussion and required medical attention. While Jordan is correct that Plaintiff's condition had not been diagnosed by a doctor, the Court takes issue with Jordan's conclusion that a lay person would not have recognized Plaintiff's vomiting as a serious medical need. It is true that vomiting can be a symptom of a number of innocuous conditions, but here, Plaintiff began vomiting in the specific context of coming off a hunger strike. It would have been reasonable for a lay person to recognize that medical intervention was required in such a situation. Plaintiff has submitted evidence that his gastrointestinal problems constituted a serious medical need. *See Jackson v. Pollion*, **733 F.3d 786, 789 (7th Cir. 2013).**

### B. Wexford Defendants (the Nurses) & the Subjective Standard

#### i. Nurse Farris

Plaintiff testified inconsistently about Nurse Farris, but taking the facts in the light most favorable to him, Plaintiff alleges that he attempted to stop her and seek medical attention after he began throwing up but before he fainted. Plaintiff testified that he began throwing up around noon. Plaintiff concedes that Nurse Farris was engaged in doing her segregation rounds at the time he tried to stop her. Plaintiff also concedes that the appropriate method of seeking medical care on the segregation ward was to tell the guard. Plaintiff also testified that the only way to see completely into a segregation cell was to open the chuckhole and look in. Based on this record, no reasonable jury could find that Farris was deliberately indifferent. Plaintiff's attempts to stop her on her rounds constitute a non-authorized method of seeking medical attention. Plaintiff testified that Farris did not stop. This means that she could not have seen into Plaintiff's cell and seen the vomit he alleges was present on the floor. Plaintiff did not describe his symptoms or give Farris any other reason to believe

9

he was suffering from a severe medical emergency. He merely tried to stop her on the grounds he needed medical attention. Even Plaintiff concedes that Farris was addressing the medical needs of other inmates at that time, and there is no dispute that the health care unit had been informed that Plaintiff had gone off his hunger strike at 10 am, prior to the start of Plaintiff's symptoms. Farris is not obligated to drop everything to attend to the non-emergency medical needs of one inmate, nor is Plaintiff entitled to seek medical attention from the provider of his choice. No reasonable jury could find Farris deliberately indifferent because there is no evidence that she knew that Plaintiff was suffering from a serious medical need from his offhand comment as she walked by.

### ii. Nurse Lucas

A reasonable jury could likewise not find Lucas deliberately indifferent on the evidence submitted. Plaintiff testified at his deposition that he believes he tried to get her attention on one day because he was not feeling well while she was passing out medication. Plaintiff cannot recall what day this occurred, although he appears to concede that it happened sometime after his first health care visit. The Defendants submitted evidence that Plaintiff was being monitored by health care after his first fainting episode for the very symptoms he complained that Lucas ignored. Dr. Obadina was aware of Plaintiff's symptoms. Additionally, at no time did anyone in health care tell Lucas to monitor Plaintiff as part of her duties. Again, there is no allegation that Lucas stopped and looked into Plaintiff's cell, although Plaintiff testified that had she done so, she would have seen various bodily fluids on the floor. Lucas was taking care of the med call line, and she was entitled to carry out that duty. There is simply no evidence that Lucas knew Plaintiff was suffering from a serious medical condition just because Plaintiff called out to her as she did the medication line rounds. Lucas is entitled to summary judgment because no reasonable jury could find that she was deliberately indifferent on this record.

### iii. Nurse Gale

Plaintiff alleges he asked Nurse Gale for medical treatment and she responded that the health care unit was doing all it could at this time. Even taking the facts in the light most favorable to Plaintiff, the medical records reflect that Gale performed an evaluation on Plaintiff during his post-hospital stay in the infirmary. She also discharged him the next day and gave him a dose of Ultram. Based on this record, no reasonable jury could find Gale liable for deliberate indifference. Plaintiff's allegations, at most, amount to a disagreement about the course of his medical treatment. But the records reflect that Gale provided an evaluation to Plaintiff as part of the health care unit's attempt to monitor his condition. She also dispensed the pain medication prescribed by Dr. Obadina, and set up a follow-up appointment for Plaintiff. Although Plaintiff appears to allege that Gale could have done more for his nausea, it is not clear what he expected Gale to do, and he has not identified a specific course of treatment that he believes she should have administered. No reasonable jury could find Gale liable for deliberate indifference on this record.

### C. Lt. Cynthia Jordan: Not Entitled to Summary Judgment re: Gastrointestinal Problems

Lt. Jordan is not entitled to summary judgment. Plaintiff's testimony is that Jordan was informed that he was suffering from a serious medical need and needed medical attention. In response, Jordan said that she would not get treatment for Plaintiff because she was angry that he was on a hunger strike. Jordan has submitted an affidavit refuting these facts. However, it is a material issue of fact whether Jordan knew that Plaintiff was suffering from a condition requiring medical treatment. Because there is a dispute and Plaintiff has offered his sworn testimony that he heard a guard tell Jordan that Plaintiff needed medical treatment, and the Jordan yelled back that she would not refer him, Plaintiff has submitted sufficient evidence to survive summary judgment on this point.

### 2. Count Two: Deliberate Indifference to Head Injury

Defendants do not dispute that a concussion or a head injury is a serious medical need under § 1983. Additionally, the medical records reflect that Plaintiff has a knot on his head after his first spell of unconsciousness and continued to experience dizziness and nausea afterwards. His second head injury was specifically diagnosed as a concussion and required emergency hospitalization. Therefore, the Court concludes that Plaintiff's head injuries constitute a serious medical need.

**A. Wexford Defendants**

  **i. Nurse Farris**

Plaintiff offered no testimony that Nurse Farris knew he had suffered a concussion or had any hand in the treatment of that injury. Additionally, the medical records show that Plaintiff was taken to health care and seen by a physician immediately after both of his falls. Nurse Farris is entitled to summary judgment re: Plaintiff's head injury.

  **ii. Nurse Lucas**

Likewise, Plaintiff has submitted no evidence that Nurse Lucas knew or was in any way involved in the treatment of his head injury. He claims that the guard told her that Plaintiff was ill, and that there was blood and vomit on the floor of his cell at the time he saw her, but none of this would have put Lucas on notice that she needed to intervene in the treatment of Plaintiff's head injury. Plaintiff was under the supervision of the health care unit after his first fainting episode. The evidence suggests that he was treated promptly after both episodes of fainting. No reasonable jury could find Nurse Lucas liable on these facts.

  **iii. Nurse Gale**

Again, Plaintiff's only testimony as to Nurse Gale was that he asked her for medical treatment and she responded that the health care unit was doing all it could at the time. The medical records bear this out. According to the records, Gale checked on Plaintiff, performed an assessment, gave

him his prescription medication, discharged him on the doctor's orders, and scheduled a follow-up visit to check on Plaintiff's concussion. Based on this record, it is difficult to tell what more Nurse Gale could have done, and Plaintiff has not suggested anything. Gale undertook to treat Plaintiff for his concussion. Based on this record, no reasonable jury could find that Gale was deliberately indifferent to Plaintiff's head injury.

### iv. Nurse Melvin

The evidence against Melvin is vague. At one point, Plaintiff testified that he believed that he saw Melvin pass out medication to inmates on August 22, 2009, while at another time he believes he saw her at sick call on either August 22 or August 23. Assuming that Plaintiff's testimony that he tried to stop Melvin while she passed out medication in the sick call line is true, there is not sufficient evidence for a reasonable fact finder to infer that Melvin's conduct constituted deliberate indifference.

Plaintiff was still under observation by the health care unit at this time. The records reflect that a nurse checked on him at approximately 9 pm, and Plaintiff reported that he was "doing ok." The records also reflect that he was checked again at 4 am, and the non-defendant nurse reported that Plaintiff was resting comfortably. Dr. Obadina had determined that Plaintiff's condition could be monitored from his cell and directed staff to check on him, which they did. Plaintiff's testimony is that he showed Melvin his bloody nose, but that would not have put her on notice that he was at risk for a further head injury. Nor is there any evidence that Melvin knew about Plaintiff's head injury and refused to treat it. Plaintiff did not offer any testimony on this point. Based on this record, there is insufficient evidence for a reasonable jury to conclude that Melvin was deliberately indifferent.

### B. Lt. Cynthia Jordan entitled to Summary Judgment re: Head Injury

Jordan has submitted an affidavit that she found Plaintiff unresponsive in his cell on the intake wing, and had Plaintiff sent to the health care unit. Plaintiff testified that Lt. Bradley, who is not a defendant here, is the one who discovered him. Even crediting Plaintiff's version of events, Plaintiff

concedes that he was escorted to health care within ten minutes of his head injury. Plaintiff also testified that he was moved from Jordan's wing to a different area of segregation upon returning from the health care unit and that she had nothing further to do with his care at that time. Based on this record, there is insufficient evidence to find that Jordan was deliberately indifferent because it is undisputed that Plaintiff was immediately treated once staff was aware of his first head injury. Therefore, there was no risk of further immediate harm from the head injury because it was already being addressed, and Jordan could not have been deliberately indifferent during that time. Likewise, Jordan had no involvement in Plaintiff's second head injury. Jordan is entitled to summary judgment on Plaintiff's claim that she was deliberately indifferent to his head injury.

## CONCLUSION

For the foregoing reasons, summary judgment is **GRANTED** as to Defendants Gale, Lucas, Ferris and Melvin. (**Doc. 71**). Those Defendants shall be **DISMISSED with prejudice** and judgment in their favor shall be entered at the close of this case. Defendant Jordan's Motion for Summary Judgment is **DENIED in part and GRANTED in part**. (**Doc. 74**). The claims against her for deliberate indifferent to Plaintiff's gastrointestinal problems shall proceed to trial. However, Jordan is entitled to summary judgment on Plaintiff's claim that she was deliberately indifferent to Plaintiff's head injury, and judgment in her favor on this point should be entered at the close of the case.

**IT IS SO ORDERED.**

**DATED: September 11, 2014**

s/ *Michael J. Reagan*
**MICHAEL J. REAGAN**
United States District Judge